UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOHN ZDZIEBLOSKI, *et al.*,

                    Plaintiffs,

        -against-                                    1:15-CV-0298 (LEK/CFH)

TOWN OF EAST GREENBUSH,

                    Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiffs John and Sheila Zdziebloski commenced the present action against defendant

Town of East Greenbush, alleging violations of the Clean Water Act ("CWA"), 33 U.S.C. § 1251

*et seq.* Dkt. Nos. 1 ("Complaint"), 4 ("Amended Complaint"). Presently before the Court are the

Town's Motion for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment.

Dkt. Nos. 36 ("Town Motion"), 43 ("Plaintiffs' Motion"); see also Dkt. Nos. 36-21 ("Town

Memorandum"), 36-20 ("Town Statement of Material Facts"), 43-1 ("Plaintiffs' Memorandum"),

43-2 ("Plaintiffs' Statement of Material Facts"), 47-6 ("Town Response"), 50 ("Plaintiffs'

Reply"). For the reasons that follow, the Town Motion is granted and Plaintiffs' Motion is

denied.

## II.   BACKGROUND

### A.  Factual Background

Since around 1977, Plaintiffs have lived at 16 Worthman Lane in Rensselaer, New York.

Town SMF ¶ 13; Pls.' SMF ¶ 13. They allege that the Town has neglected its responsibility to

maintain a stormwater detention basin located on Onderdonk Estates, a residential development

northwest of Plaintiffs' house. Am. Compl. ¶¶ 7, 9, 14. According to Plaintiffs, this neglect has led to flooding on their property. Town SMF ¶¶ 2–3; Pls.' SMF ¶¶ 2–3; Am. Compl. ¶ 15–17. Specifically, Plaintiffs allege that the Town's improper maintenance of the stormwater detention basin has caused the basin and its associated equipment to discharge pollutants, including "silt, mud, dirt, clay and runoff from streets," into a pond on Plaintiffs' property known as "Sheila's Pond," thereby causing flooding on both the pond and other parts of the property. Town SMF ¶¶ 3, 5; Pls.' SMF ¶¶ 3, 5; Am. Compl. ¶¶ 12–16. The parties agree that "no streams or tributaries or any such kinds of water courses" naturally flow out of or into Sheila's Pond. Town SMF ¶¶ 9–10; Pls.' SMF ¶¶ 9–10. The Court first discusses the impact of the stormwater detention basin on Plaintiffs' property, then turns to the question whether Sheila's Pond constitutes a "water[] of the United States" under the CWA. 33 U.S.C. § 1362(7).

### 1. The Impact of the Stormwater Detention Basin on Plaintiffs' Property

The Town disputes (or asserts it lacks knowledge about) several aspects of Plaintiffs' description of the impact of the stormwater detention basin on Sheila's Pond. Pls.' SMF ¶¶ 3–26; Dkt. No. 47-5 ("Town Response SMF") ¶¶ 3–26. But because none of these facts are material to the Court's decision, the Court recites Plaintiffs' version of these events without discussing the Town's denials, see Wright v. Yacovone, No. 12-CV-27, 2014 WL 1165834, at *6 (D. Vt. Mar. 21, 2014) (describing contested facts as "not material [to the] summary judgment determination because, even accepting Plaintiff's version of these facts as true, they do not preclude judgment as a matter of law in Defendants' favor").

Onderdonk Estates "lies uphill, to the north and west of [Sheila's] [P]ond." Dkt. No. 43-3 ("Gifford Affidavit") ¶ 9. The Town approved construction of Onderdonk Estates, which began

in the 1970s and '80s and took place in four stages. Id. The stormwater detention basin was designed to "retain runoff from the development," which "increased and flowed to Sheila's [P]ond more quickly and with greater volume" as construction progressed. Id. Runoff increased in the development because of the growth in the number of "impermeable surfaces such as pavements and roofs." Id. Although the basin and "associated piping[] and structures" were "supposed to be turned over to the Town," that never happened. Id. ¶ 17. Instead, since March 25, 1993, a private citizen named Paul Silverstein has owned the property on which the basin is located. Town SMF ¶ 18; Pls.' SMF ¶ 18.

Because the Town failed to take ownership of the stormwater detention basin, it was not maintained and fell "into a state of disrepair." Gifford Aff. ¶ 18. The basin stopped retaining water, and "a sinkhole . . . developed adjacent to the morning glory structure [a type of spillway]." Id. Water began to flow on "a path along the outside of the outlet piping . . . and found its way to the ground surface near the bottom of the slope near Sheila[']s Pond." Id. The flow of water caused the soil around the outlet piping to erode, thereby rupturing the piping and "open[ing] a large ravine where the sand soil has been fully eroded." Id. ¶ 19. The result is that "seeping water now cascades like a water fall [sic] as it exits the ground surface." Id. Further, the eroded soil ends up in Sheila's Pond, which has caused the formation of a delta along with a reduction in the pond's volume and "detention capacity." Id. ¶ 20. This, in turn, leads to flooding during "large storm event[s], [when] the water level rises and inundates the guest house, the basement of the main house, and a store roof in the yard that shelters equipment." Id. ¶ 12.

## 2. *Is Sheila's Pond a "Water[] of the United States"?*

The parties dispute whether Sheila's Pond constitutes a "water[] of the United States" subject to regulation under the CWA. 33 U.S.C. § 1362(7). Plaintiffs' expert, Gregory Gifford, states that the CWA covers Sheila's Pond, which is "within 4,000 feet of a tributary" of the Hudson River, because the pond is connected to the tributary in the following manner: "[w]hen Sheila's Pond overflows its boundaries, the water flows across the Zdziebloskis' property, across Worthman Lane, and across the farm field south of Worthman Lane to the tributary." Gifford Aff. ¶ 24. In his Affidavit, Gifford does not say how he came to this conclusion, but during his deposition he stated that while he himself had never witnessed flooding of that sort, "John Z[dziebloski] ha[d] it seen happen, and that's my basis for that." Dkt. No. 43-17 ("Gifford Deposition") at 85:19–86:2. Yet John Zdziebloski said in *his* deposition that he had never told Gifford that that type of natural flooding had ever occurred. Dkt. No. 36-17 ("Zdziebloski Deposition") at 16:25–17:4. Instead, on two occasions about ten years ago, the flooding caused by the failing stormwater detention basin was so severe that it "forced [Zdziebloski] to rent a pump and hose and pump out water from [his] backyard for three days in a row." Dkt. No. 43-6 ("Zdziebloski Affidavit") ¶ 9. "Schools of fish and turtles were pumped to the [tributary] along with the water," id., and Gifford saw photos of these events, Gifford Dep. at 86:7–19.

Gifford also claims that "water from Sheila's Pond *possibly* seeps through the porous soils underneath Route 9&20 to the wetland area where the unnamed tributary [of the Hudson River] begins." Gifford Aff. ¶ 24 (emphasis added). Gifford does not specify the basis for this possibility, though John Zdziebloski provides some elaboration. He states that "[t]he fill material underneath Route 9&20 is porous gravel," and that because the wetland "northeast of Route[]

4

9&20 . . . was not filled in," it "provides enough water to the [tributary] for year-round flow." Zdziebloski Aff. ¶ 7. According to John, "that is evidence that water continues to seep [from Sheila's Pond] through the porous gravel fill underneath Route 9&20, hydrologically connecting the Pond to the wetland." Id. John believes that "water *must* be seeping out of the Pond through the gravel fill underneath Route 9&20 to the wetland, or else the Pond would overflow, just as a bathtub would." Id. ¶ 8. According to Plaintiffs' witness list, John is one of their lay witnesses, and Gifford is their only expert witness. Dkt. No. 33 ("Plaintiffs' Witness List") at 1–2.

The Town's expert witness, Johanna Duffy, inspected Sheila's Pond and reviewed relevant materials to "determine if there were any surface or subsurface water connections between the Pond and other aquatic resources." Dkt. No. 36-18 ("Duffy Affidavit") ¶¶ 7–8. Duffy concluded that "[n]o regulated resources provide inputs to the Pond, and the Pond does not have an outlet." Id. Ex. C, at 3. Further, "[s]urface water observed within the Pond was stagnant (i.e., no observed flow), and the Pond was observed to not be hydrologically connected to any other wetland and/or water resources." Id. Finally, Duffy noted that "no biological, chemical, or physical connection to the Hudson River [from Sheila's Pond] was determined to exist." Id.

### B. Procedural History

Plaintiffs initiated this lawsuit on March 13, 2015, Compl., and they filed their Amended Complaint on March 23, 2015, Am. Compl. The Amended Complaint asserts that the Town has violated and continues to violate the CWA via "the unauthorized discharges of pollutants . . . into the waters of the United States." Am. Compl. ¶ 2. Specifically, Plaintiffs allege that the Town has been discharging pollutants without a permit from its stormwater system into Sheila's Pond, "which is among the waters of the United States." Id. ¶¶ 10, 12–13. On December 30, 2016, the

Town moved for summary judgment, arguing primarily that the CWA does not cover Sheila's Pond and that it is not responsible for maintaining the stormwater detention basin on Onderdonk Estates. Town Mem. at 20–24. On January 19, 2017, Plaintiffs filed a cross-motion for summary judgment, arguing that the Town is liable under the CWA because its refusal to properly maintain the basin shows a failure to comply with the terms of its permit for operating a municipal separate storm sewer system ("MS4"). Pls.' Mem. at 13–14. Indeed, Plaintiffs argue that even if Sheila's Pond does not constitute a water of the United States—which they dispute—the Town is still liable simply because it has violated the terms of its MS4 permit. Id. at 20. Notably, this was the first time Plaintiffs had argued that they were entitled to relief based solely on the Town's failure to abide by the terms of its MS4 permit rather than on the Town's discharge of pollutants into Sheila's Pond. Finally, Plaintiffs reject the contention that the Town has no responsibility for the basin merely because it does not own it. Id. at 15.

## III.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

### A.  Background on the Clean Water Act

The purpose of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). To that end, the CWA prohibits "the discharge of any pollutant by any person," "[e]xcept as in compliance" with several exceptions, including one for permitted discharges established by § 1342. § 1311(a); accord Riverkeeper, Inc.

v. Mirant Lovett, LLC, 675 F. Supp. 2d 337, 343 (S.D.N.Y. 2009) ("The Clean Water Act expressly prohibits discharge of any pollutant into navigable waters without an appropriate permit issued by the United States Environmental Protection Agency . . . or under a federally approved state permit system."). "Section 505 of the CWA provides in relevant part that 'any citizen may commence a civil action on his own behalf' against any person 'who is alleged to be in violation' either 'of an effluent standard or limitation under this chapter' or 'of an order issued by the Administrator or a State with respect to such a standard or limitation.'" Soundkeeper, Inc. v. A & B Auto Salvage, Inc., 19 F. Supp. 3d 426, 431 (D. Conn. 2014) (quoting § 1365(a)(1)). "Before filing suit, a citizen must provide 60 days' notice to: (i) the EPA Administrator; (ii) the State in which the alleged violation occurs; and (iii) any alleged violator." Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. #1, 16 F. Supp. 3d 294, 301 (S.D.N.Y. 2014) (quoting 33 U.S.C. § 1365(b)(1)(A)). In New York, "[i]f neither the E[nvironmental Protection Agency] nor [the New York Department of Environmental Conversation] commences an action within that sixty-day notice period, the citizen[] may bring a suit in District Court seeking civil penalties and/or equitable relief." Id.

The CWA defines the "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." § 1362(12). It defines "navigable waters" as "the waters of the United States, including the territorial seas," § 1362(7), and "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged," § 1362(14). Finally, the CWA defines "pollutant" broadly, see Long Island

Soundkeeper Fund, Inc. v. N.Y. Athletic Club, No. 94-CV-436, 1996 WL 131863, at *14 (S.D.N.Y. Mar. 22, 1996) (noting that the CWA adopted a "broad statutory definition of 'pollutant'"), and the term includes, among other things, "rock [and] sand," § 1362(6).

"In 2015, the EPA and the U.S. Army Corps of Engineers adopted a new rule modifying the definition of 'waters of the United States.'" Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA, 846 F.3d 492, 505 n.14 (2d Cir. 2017) (citing Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054, 37,055–56 (June 29, 2015)). But "[t]hat rule is currently stayed nationwide, pending resolution of claims that the rule is arbitrary, capricious, and contrary to law." U.S. Army Corps of Eng'rs v. Hawkes Co., 136 S. Ct. 1807, 1812 n.1 (2016) (citing In re EPA, 803 F.3d 804, 807–09 (6th Cir. 2015)). Under the previous set of regulations, "waters of the United States" "encompass traditionally navigable waterways, including, *inter alia*, '[a]ll waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce,' and their '[t]ributaries.'" Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 216 (2d Cir. 2009) (alterations in original) (quoting 40 C.F.R. § 230.3(s)(1), (5) (2008)). These regulations also provided that "[w]aters . . . include '[w]etlands adjacent to [jurisdictional] waters (other than waters that are themselves wetlands).'" Id. (second and third alterations in original) (quoting § 230.3(s)(7)).

In Rapanos v. United States, 547 U.S. 715 (2006), the Supreme Court considered whether the CWA covers "discharges of pollutants into wetlands adjacent to nonnavigable tributaries of traditional navigable waters." United States v. Cundiff, 555 F.3d 200, 207 (6th Cir. 2009) (citing Rapanos, 547 U.S. at 729–30). No opinion in Rapanos received more than four votes, and Justice Scalia's plurality opinion and Justice Kennedy's concurrence offered dueling tests for

9

determining whether a wetland adjacent to a tributary of a traditional navigable water is subject to regulation under the CWA. 547 U.S. at 810 (Stevens, J., dissenting) (noting that Justice Scalia and Justice Kennedy's "respective opinions define different tests to be applied on remand"). According to Justice Scalia, "wetlands should only fall within CWA jurisdiction when they: (1) are adjacent to a 'relatively permanent body of water connected to traditional interstate navigable waters'; and (2) have 'a continuous surface connection with that water.'" Precon Dev. Corp., Inc. v. U.S. Army Corps of Eng'rs, 633 F.3d 278, 288 (4th Cir. 2011) (quoting Rapanos, 547 U.S. at 742) (plurality opinion)).

Under Justice Kennedy's approach, "when the Corps 'seeks to regulate wetlands based on adjacency to nonnavigable tributaries,' it must establish that a 'significant nexus' exists 'between the wetlands in question and navigable waters in the traditional sense.'" Id. (quoting Rapanos, 547 U.S. at 779, 782 (Kennedy, J., concurring in the judgment)). A "significant nexus" exists when "the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Rapanos, 547 U.S. at 780. But where the "wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" Id. The question is whether the wetlands "perform critical functions related to the integrity of other waters—functions such as pollutant trapping, flood control, and runoff storage." Id. at 779.

The question here is whether Sheila's Pond, which the parties appear to assume is a wetland, is a "water[] of the United States" under the CWA. § 1362(7). If it is not, the Town cannot be liable under § 1311(a) or § 1342 for allowing the discharge of pollutants into the pond.

10

The courts of appeals are split on which Rapanos opinion is controlling, see United States v.

Donovan, 661 F.3d 174, 180–81 (3d Cir. 2011) (describing the circuit split that has developed

over which opinion in Rapanos provides the controlling standard), and the Second Circuit has yet

to weigh in on this debate. The Court need not reach this question, however, because Plaintiffs

have failed to come forward with admissible evidence sufficient to allow a reasonable jury to

conclude that either Justice Kennedy's or Justice Scalia's test has been satisfied. See Simsbury-

Avon Preservation Soc., LLC v. Metacon Gun Club, Inc., 472 F. Supp. 2d 219, 226–27 (D.

Conn. 2007) ("[T]his Court will consider under both the plurality's and Justice Kennedy's

standards the issue of whether the plaintiffs have demonstrated a genuine factual dispute about

whether [the defendant's] munitions are being discharged into the waters of the United States."),

aff'd sub nom. Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199 (2d Cir. 2009).

   **B.  The Admissibility of Plaintiffs' Evidence**

       As noted above, the Town's expert says that there are no outlets from or inputs to the

pond, and that the pond lacks a hydrological connection to any other body of water. Duffy Aff.

Ex. C, at 3. Plaintiffs respond by offering three theories for CWA jurisdiction over the pond.

First, Plaintiffs' expert, Gregory Gifford, claims that "[w]hen Sheila's Pond overflows its

boundaries, the water flows across the Zdziebloskis' property, across Worthman lane, and across

the farm field south of Worthman Lane to the tributary." Gifford Aff. ¶ 24. According to

Plaintiffs, this shows that Sheila's Pond is "hydrologically connected to the wetland" and to the

tributary of the Hudson River, Pls.' Mem. at 20, which neither party disputes is a traditional

navigable water and thus under the jurisdiction of the CWA, see United States v. Am. Cyanamid

Co., 354 F. Supp. 1202, 1203 (S.D.N.Y.) (describing the Hudson River as "part of the navigable waters of the United States"), aff'd, 480 F.2d 1132 (2d Cir. 1973).

Second, John Zdziebloski himself proposes that "water continues to seep [from Sheila's Pond] through the porous gravel fill underneath Route 9&20, hydrologically connecting the Pond to the wetland." Zdziebloski Aff. ¶ 7. According to John, "water *must* be seeping out of the Pond through the gravel fill underneath Route 9&20 to the wetland, or else the Pond would overflow, just as a bathtub would." Id. ¶ 8. Gifford endorses this theory without providing any explanation as to how he came to accept it, stating only that "water from Sheila's Pond *possibly* seeps through the porous soils underneath Route 9&20 to the wetland area where the unnamed tributary [of the Hudson River] begins." Gifford Aff. ¶ 24 (emphasis added).

Third, Plaintiffs note that "on two occasions, [they] have pumped water from Sheila pond to the [tributary]." Pls.' Mem. at 20. According to Plaintiffs, "[t]he pump was large enough that turtles and schools of fish were pumped to the stream along with the water." Id. Since Plaintiffs' first two theories are not supported by any evidence that would be admissible at trial, the Court cannot consider them in evaluating the parties' motions for summary judgment. See, e.g., Levarge v. Preston Bd. of Educ., 552 F. Supp. 2d 248, 251 n.3 (D. Conn. 2008) ("The evidence proffered by a party in opposition to a motion for summary judgment must be admissible at trial." (citing Caputo v. Pfizer, Inc., 267 F.3d 181, 188 (2d Cir. 2001))). The Court addresses the third theory in the next section, but suffice it to say for now that it is insufficient under either Justice Kennedy's or Justice Scalia's approach to show that the CWA covers Sheila's Pond.

Gifford purports to be testifying as an expert witness when he suggests that Sheila's Pond sometimes overflows its boundaries and causes water to end up in the tributary. Witness List at 2.

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" the following conditions are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The Supreme Court has characterized the admissibility standard under Rule 702 as imposing a two-fold task of 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Borgognone v. Trump Plaza, No. 98-CV-6139, 2000 WL 341135, at *3 (E.D.N.Y. Mar. 9, 2000) (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)). "An expert's opinions that are without factual basis and are based on speculation or conjecture are . . . inappropriate material for consideration on a motion for summary judgment." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311–12 (2d Cir. 2008); see also Hollman v. Taser Int'l Inc., 928 F. Supp. 2d 657, 666 (E.D.N.Y. 2013) ("[I]t is the proper role of the district court to consider the admissibility of expert testimony in determining whether summary judgment is warranted . . . ."); Borgognone, 2000 WL 341135, at *2 ("If a proffer of expert testimony in the form of an expert report is excluded as inadmissible under Rule 702, the summary judgment determination is made on a record that does not include that evidence." (citing Raskin v. Wyatt Co., 125 F.3d 55, 66–67 (2d

Cir. 1997))). "The burden of establishing the reliability of an expert's theories pursuant to the standards set forth in Federal Rule 702 and <u>Daubert</u> falls squarely with the proponent, who must establish reliability by a preponderance of the evidence." <u>Lara v. Delta Int'l Mach. Corp.</u>, 174 F. Supp. 3d 719, 734 (E.D.N.Y. 2016)).

Gifford himself admitted in his deposition that the only basis for his conclusion that Sheila's Pond sometimes overflows and thereby causes water to naturally find its way to the tributary is that John Zdziebloski told him so. Gifford Dep. at 85:19–86:2. But John stated in his deposition that he had never told Gifford this, and that water did not come from the pond "on its own," as Gifford thought, but only through pumping. Zdziebloski Dep. at 16:25–17:4. Gifford's testimony about this theory is therefore inadmissible under Rule 702, because it is plainly not "based on sufficient facts or data." Fed. R. Evid. 702(b). Instead, it is based solely on Gifford's belief that John Zdziebloski had witnessed an event that John himself denied ever seeing or telling Gifford about. Thus, Gifford's testimony in support of this theory of CWA jurisdiction cannot be considered in resolving the pending summary judgment motions. <u>See</u> <u>Macaluso v. Herman Miller, Inc.</u>, No. 01-CV-11496, 2005 WL 563169, at *8 (S.D.N.Y. Mar. 10, 2005) (rejecting as inadmissible an expert opinion that was "based on incorrect factual assumptions").

Plaintiffs' second argument for CWA jurisdiction over Sheila's Pond is that water is seeping from the pond through porous gravel to a nearby wetland, which in turn is connected to the tributary that eventually leads to the Hudson River. Pls.' Mem. at 20. Plaintiffs cite John Zdziebloski's affidavit in support of this theory. <u>Id.</u> There, John opines that "water *must* be seeping out of the Pond through the gravel fill underneath Route 9&20 to the wetland, or else the Pond would overflow, just as a bathtub would." Zdziebloski Aff. ¶ 8. The problem is that

Plaintiffs have offered no evidence that John Zdziebloski is qualified to testify about the hydrological connections between Sheila's Pond and nearby bodies of water. Indeed, Plaintiffs classify John as a lay witness in their Witness List. Witness List at 1. John's view that Sheila's Pond provides, through porous gravel, water that fills a nearby wetland does not "result[] from a process of reasoning familiar in everyday life," a requirement for admitting the testimony of a lay witness such as John. United States v. Natal, 849 F.3d 530, 536 (2d Cir. 2017) (quoting United States v. Cuti, 720 F.3d 453, 459 (2d Cir. 2013)); see also Jones v. Thorne, No. 97-CV-1674, 1999 WL 672222, at *7 (D. Or. Aug. 28, 1999) (deeming inadmissible an expert's opinion on hydrology and other issues in which he admitted a lack of expertise because "[w]ithout any specialized training or experience, it is doubtful that he could have personal knowledge about such scientific or technical events"). Further, to the extent that Plaintiffs intend to present John as an expert on hydrology, "Rule 702 requires that expert testimony come from someone who is 'qualified as an expert by knowledge, skill, experience, training or education,' whose testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" Lippe v. Bairnco Corp., 288 B.R. 678, 686 (S.D.N.Y. 2003) (quoting Fed. R. Evid. 702), aff'd, 99 F. App'x 274 (2d Cir. 2004). As just noted, there is no indication in the record that John is in any way qualified to testify about hydrology. Thus, the Court cannot consider John's testimony on this theory of CWA jurisdiction over Sheila's Pond.

Gifford attempts to lend support to the porous-gravel theory when he states that "water from Sheila's Pond *possibly* seeps through the porous soils underneath Route 9&20 to the wetland area where the unnamed tributary [of the Hudson River] begins." Gifford Aff. ¶ 24 (emphasis added). But Gifford fails to explain how he came to believe in this possibility, and an

expert's conclusory assertion that something is "possible" is insufficient to render the opinion admissible. See, e.g., Major League Baseball Properties, 542 F.3d at 311 ("An expert's conclusory opinions are . . . inappropriate [and therefore must be excluded.]"); Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) ("[E]xpert testimony should be excluded if it is speculative or conjectural."); Colon v. Abbott Labs., 397 F. Supp. 2d 405, 414 (E.D.N.Y. 2005) (rejecting an expert's report as inadmissible because it stated merely that there was a "'very strong possibility' that infant formula causes [type-one juvenile diabetes] and that there [wa]s 'theoretical, laboratory, and epidemiological evidence to back up the possibility'"); Barban v. Rheem Textile Sys., Inc., No. 01-CV-8475, 2005 WL 387660, at *6 (E.D.N.Y. Feb. 11, 2005) ("It is by now well settled that Daubert and its progeny require[] the Court to close the gate to opinion evidence . . . that is bottomed upon nothing more than speculation . . . ."). Since Gifford provides absolutely no explanation for his conclusory assertion that John Zdziebloski's porous-gravel theory is possibly true, Gifford's opinion on this theory cannot be considered in deciding the parties' summary judgment motions.

That leaves Plaintiffs' assertion that they have twice pumped water from Sheila's Pond to the tributary as the only evidence for CWA jurisdiction that the Court may consider in deciding whether a genuine dispute of material fact exists as to whether the pond is a "water[] of the United States" under the CWA. § 1362(7). That assertion is not enough to defeat the Town's motion for summary judgment.

### C. The Water-Pump Theory of Jurisdiction

Under the plurality opinion in Rapanos, the CWA covers a wetland such as Sheila's Pond when "the adjacent channel [here, the tributary] contains a 'wate[r] of the United States,' (i.e., a

relatively permanent body of water connected to traditional interstate navigable waters); and . . . the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." 547 U.S. at 742. "Although the term 'continuous surface connection' clearly requires surface flow, it does not mean that only perpetually flowing creeks satisfy the plurality's test." Cundiff, 555 F.3d at 212. Moreover, "in determining whether the [CWA] confers jurisdiction [under the plurality opinion in Rapanos], it does not make a difference whether the channel by which water flows from a wetland to a navigable-in-fact waterway or its tributary was manmade or formed naturally." Id. at 213. Nonetheless, "[w]etlands with only an intermittent, physically remote hydrologic connection to 'waters of the United States' . . . lack the necessary connection to covered waters [to confer CWA jurisdiction]." Rapanos, 547 U.S. at 742 (plurality opinion).

Plaintiffs have lived at 16 Worthman Lane for approximately forty years, Town SMF ¶ 13; Pls.' SMF ¶ 13, and "on two occasions, [they] . . . pumped water from Sheila pond to the [tributary]," Pls.' Mem. at 20.[1] On those two occasions, "[s]chools of fish and turtles were pumped to the [tributary] along with the water." Zdziebloski Aff. ¶ 9. That is not enough to show a continuous surface connection between Sheila's Pond and the tributary. Indeed, if this evidence does not suggest merely "an intermittent, physically remote hydrologic connection" between Sheila's Pond and the tributary, Rapanos, 547 U.S. at 742 (plurality opinion), it is hard to imagine what would. Further, Plaintiffs have not pointed to any evidence that the two occasions

---

[1] In his Affidavit, John Zdziebloski says that he and his son-in-law pumped the water, Zdziebloski Aff. ¶ 9, but Plaintiffs suggest elsewhere that they (John and Sheila Zdziebloski) were responsible for pumping the water, Pls.' Mem. at 20.

on which they pumped water from the pond to the tributary have made it "difficult to determine where the 'water' ends and the 'wetland' begins." Id.

One district court in this circuit reached the same conclusion on an analogous set of facts. In Simsbury-Avon Preservation Society, the plaintiffs presented evidence that wetlands located on a shooting range run by the defendant contained standing water that found its way to a cove leading to a river. 472 F. Supp. 2d at 228. Flooding was common in the area, and one of the plaintiffs submitted photographs showing that, during "heavy rains and thawing of snow and ice," "a surface water connection exist[ed] between the [shooting range] and horseshoe Cove, which flow[ed] into the Farmington River." Id. Yet there was evidence that these conditions were quite rare, and one of the shooting range's members or employees stated that he had seen such conditions only twice. Id. The court found that "[w]hile plaintiffs ha[d] offered evidence showing that a surface water connection does at times exist, they offer[ed] no evidence demonstrating a *continuous* connection between the . . . wetland and Horseshoe Cove or the Farmington River." Id. at 229 (emphasis added).[2] This Court sees no reason to depart from the reasoning of the Simsbury-Avon Preservation Society court, and therefore Plaintiffs' evidence that they twice pumped water from Sheila's Pond to the tributary is not enough to satisfy Justice Scalia's test in Rapanos.

This evidence also fails Justice Kennedy's "significant nexus" test. Under Justice Kennedy's concurring opinion in Rapanos, wetlands such as Sheila's Pond "come within the statutory phrase 'navigable waters[]' if the wetlands, either alone or in combination with

---

[2]  The Second Circuit affirmed the decision in Simsbury-Avon Preservation Society without reaching the issue just discussed. Cordiano, 575 F.3d at 218, 225.

18

similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" 547 U.S. at 780. In other words, there must be "a significant nexus between the wetlands in question and navigable waters in the traditional sense," id. at 779, and "[w]etlands possessing this significant nexus are those that 'perform critical functions related to the integrity of other waters—functions such as pollutant trapping, flood control, and runoff storage,'" Precon Dev. Corp., 633 F.3d at 289 (quoting Rapanos, 547 U.S. at 779). "When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" Rapanos, 547 U.S. at 780.

Plaintiffs have not presented any evidence suggesting that the two occasions on which they pumped water from Sheila's Pond to the tributary show that the pond "perform[s] critical functions related to the integrity of other waters—functions such as pollutant trapping, flood control, and runoff storage." Rapanos, 547 U.S. at 779 (Kennedy, J., concurring).[3] John Zdziebloski asserts that "[s]chools of fish and turtles were pumped to the stream along with the water." Zdziebloski Aff. ¶ 9. But there is no evidence in the record that these turtles and fish—or any other aspects of the pond—perform any ecologically significant functions for the tributary or the Hudson River itself.

Plaintiffs cite Northern California River Watch v. City of Healdsburg, 496 F.3d 993 (9th Cir. 2007), but that case merely illustrates how deficient Plaintiffs' evidence is in this regard. In City of Healdsburg, the pond at issue had "an actual surface connection" to the river "when the

_____

[3] Plaintiffs have not argued that Sheila's Pond should be considered "similarly situated" to other wetlands in the area, Rapanos, 547 U.S. at 780, so the Court determines only whether the pond itself satisfies Justice Kennedy's test.

19

"[r]iver overflow[ed] the levee and the two bodies of water commingle[d]." Id. at 1000. There was

"also an underground hydraulic connection between the two bodies [of water]," and "at least 26

percent of the Pond's volume annually reache[d] the River itself." Id. Further, there was evidence

that "[t]he Pond and its wetlands support[ed] substantial bird, mammal and fish populations, all

as an integral part of and indistinguishable from the rest of the . . . River ecosystem." Id. at 1001.

Finally, the pond "significantly affect[ed] the chemical integrity of the . . . River by increasing its

chloride levels." Id. Plaintiffs have not come close to offering that kind of evidence. Accordingly,

no reasonable jury could find that they have satisfied Justice Kennedy's test in Rapanos, and

summary judgment must be granted in favor of the Town on the ground that Sheila's Pond is not

covered by the CWA.

**D.  The Freestanding MS4 Permit Claim**

Plaintiffs argue that "[e]ven if this Court decides that the Pond is not a water of the

United States, . . . summary judgment should be granted in favor of Plaintiffs based on the

Town's violation of its MS4 permit." Pls.' Mem. at 20. Plaintiffs' problem is that they raise this

claim for the first time in their cross-motion for summary judgment. "[I]t is black letter law that a

party may not raise new claims for the first time in opposition to summary judgment," Brandon

v. City of New York, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010), and this principle applies to

cross-motions for summary judgment as well, see Evans-Gadsden v. Bernstein Litowitz Berger &

Grossman, LLP, 491 F. Supp. 2d 386, 402 (S.D.N.Y. 2007) ("Plaintiff here cannot raise a new

claim for the first time in a cross-motion for summary judgment."), aff'd sub nom. Gadsden v.

Bernstein Litowitz Berger & Grossman, 323 F. App'x 59 (2d Cir. 2009). "Thus, if a complaint

does not fairly assert facts supporting a particular cause of action, 'it is inappropriate to raise new

claims for the first time in submissions in opposition to a summary judgment motion.'" Evans v. Solomon, 681 F. Supp. 2d 233, 253 (E.D.N.Y. 2010) (quoting Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)); see also Williams v. City of New York, No. 15-CV-6900, 2016 WL 5173254, at *4 (E.D.N.Y. Sept. 21, 2016) ("[The plaintiff] has constructively amended his complaint, without leave of court, and without any notice to his adversary, after his adversary has completed discovery and moved for summary judgment on the complaint that plaintiff actually filed."); Hall v. Nat'l Bank of Pa., No. 06-CV-217, 2010 WL 1405443, at *7 (W.D.N.Y. Mar. 31, 2010) ("[T]he law is clear that a complaint cannot be amended merely by raising new theories in the papers opposing a summary judgment motion.").

Plaintiffs' Amended Complaint "does not fairly assert facts supporting a . . . cause of action" premised *solely* on the Town's violation of its MS4 permit. Evans, 681 F. Supp. 2d at 253. Instead, the Amended Complaint is crystal clear that the action is based only on "the [allegedly unpermitted and] unauthorized discharge of pollutants by Defendant into the waters of the United States[, namely Sheila's Pond]." Am. Compl. ¶ 2. None of the facts alleged in the Amended Complaint provided the Town with any inkling that Plaintiffs intended to assert a claim independent of the discharge of pollutants into Sheila's Pond. Id. ¶¶ 6–18. It was thus entirely understandable that the Town moved for summary judgment on the ground that the pond is not covered by the CWA, since the only claim asserted in the Amended Complaint would fail if that were the case.

Given that "a failure to assert a claim until the last minute will inevitably prejudice the defendant," Beckman, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000), it was improper for Plaintiffs to raise this claim at the eleventh hour, see Coram Healthcare Corp. v. Cigna, No. 00-CV-2677,

2002 WL 32910044, at *11 (S.D.N.Y. July 24, 2002) ("[A]t the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense." (quoting Beckman, 79 F. Supp. 2d at 407)); see also Caribbean Wholesales & Serv. Corp. v. U.S. JVC Corp., 963 F. Supp. 1342, 1359 (S.D.N.Y. 1997) ("[Plaintiff] in effect is apparently attempting to add a claim never addressed, or even hinted at, in the complaint. Such a step is inappropriate at the summary judgment stage, after the close of discovery, without the Court's leave, and in a brief in opposition to a dispositive motion."). Thus, the Court will not allow Plaintiffs "to pursue a previously unstated claim" separate from the challenge to the discharge of pollutants into Sheila's Pond. Hall, 2010 WL 1405443, at *8.

V.    **CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the Town's Motion for Summary Judgment (Dkt. No. 36) is **GRANTED**; and it is further

**ORDERED**, that Plaintiffs' Cross-Motion for Summary Judgment (Dkt. No. 43) is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:        May 11, 2017
              Albany, New York

Lawrence E. Kahn
U.S. District Judge

22